THE STATE, EX REL. DONOFRIO, APPELLANT, *v.* HENDERSON ET AL., BOARD OF ELECTIONS OF MAHONING COUNTY, APPELLEES.

[Cite as State, ex rel. Donofrio, v. Henderson, 4 Ohio App. 2d 183.]

(No. 4601—Decided October 18, 1965.)

*Messrs. Manchester, Bennett, Powers & Ullman,* for relator.
*Mr. Clyde W. Osborne,* prosecuting attorney, and *Mr. Loren E. Van Brocklin,* for respondents.

JOHNSON, P. J.  The case appears before this court as an appeal on questions of law.  It is from an order of the Common Pleas Court of Mahoning County.  In that court the appellant's petition for writ of mandamus was dismissed for want of jurisdiction.

On February 2, 1965, Mr. Donofrio filed with the board of

elections 53 nominating petitions containing, in all, 736 signatures. The petitions were intended to establish him as a candidate for the office of Judge of the Municipal Court of the city of Youngstown, Ohio, for the full term commencing January 2, 1966.

On July 15, 1965, the board notified Mr. Donofrio that his nominating petition was rejected for the following reason: "Insufficient signatures." On July 30, 1965, Judge Don Hanni filed a protest before the board of elections claiming in substance that there were additional invalid signatures contained in the Donofrio nominating petition. Two days later Mr. Donofrio filed a petition for writ of mandamus in Mahoning County Court of Common Pleas. He asked that court to order the election board to place his name on the ballot as above mentioned. After the protest hearing, the election board reduced the number of signatures allowed; there remained at that point only 327 valid signatures. Based on the second decision of the election board, Mr. Donofrio filed a supplemental petition for writ of mandamus. The petition was dismissed by the trial court, and an appeal was timely filed in this court. It is agreed by both parties that 551 valid signatures are required in order that Mr. Donofrio may successfully have his name on the November 2 ballot.

Mr. Donofrio asks this court to do that which he honestly feels the trial court should have done and failed to do, *i.e.*, grant the writ of mandamus which would order the Board of Elections of Mahoning County to place his name on the ballot November 2, 1965.

The principles governing the issuance of this writ are the same as in those cases that are seemingly less dramatic and of less public interest. The law is quite explicit. There must be a clear right to the relief sought.

The trial court dismissed the petition for the reason that the allegations, as set forth in the petition, under the Ohio law did not give the Common Pleas Court jurisdiction to review the election board's multitudinous findings. The dismissal was based upon the reasoning that the allegations in the petition did not specifically allege that the acts of the board of elections were performed capriciously and in bad faith. The court noted that the allegations in the petition must be specific as to the

facts constituting the alleged abuse of discretion. (*State, ex rel. Maxwell, Pros. Atty.,* v. *Schneider,* 103 Ohio St. 492, at 498; *Sullivan* v. *State, ex rel. O'Connor,* 125 Ohio St. 387; *Marlin* v. *Bd. of Election of Cuyahoga County,* 68 Ohio Law Abs. 539.)

It is from this dismissal order that Mr. Donofrio appeals and assigns as error:

"The court below erred in refusing to assume jurisdiction and to issue a writ of mandamus requiring respondent to place relator's name on the ballot for November 2, 1965, general election, as a candidate for the office of Municipal Judge for the city of Youngstown, Ohio."

At the time of the trial court's decision, the state of the law was such that the trial judge had authority for his decision. It has been held that if the relator intended to attack a factual determination it was required that he allege in his petition that the findings by the board of elections on these matters were the result of fraud or corruption. *State, ex rel. Waltz, a Taxpayer,* v. *Michell,* 124 Ohio St. 161.

Further, it has been held that if the relator intended to attack a legal determination he had to allege in his petition that the findings by the election board on these matters were the result of flagrant misinterpretation of a statute or a clear disregard of legal provisions applicable thereto. *State, ex rel. Hanna,* v. *Milburn,* 170 Ohio St. 9. See, also, *Sullivan* v. *State, ex rel. O'Connor,* 125 Ohio St. 387, 392.

Since the time of the lower court's determination, the Ohio Supreme Court has announced its decision in *State, ex rel. Cline,* v. *Henderson* (October 5, 1965), 4 Ohio St. 2d 7, which was a mandamus action to compel the Board of Elections of Mahoning County to certify the validity of relator's nominating petition and to place his name on the ballot as a candidate for the office of township trustee. The question of jurisdiction was raised by the respondents' filing of a demurrer to the relator's petition. Counsel for Cline are also counsel for Mr. Donofrio, and it is of interest to note that the jurisdictional allegations in both cases are identical, to wit:

"In so finding the board failed in the performance of its legal duty to count all valid signatures on said petition and acted unlawfully, arbitrarily and abused its discretion."

Therefore, on the basis of the *Cline case,* we hold that the

jurisdiction of the Common Pleas Court was invoked in this case.

Under the circumstances, we feel that justice demands that relator be given an opportunity for a court review of what he contends is a clear disregard or misinterpretation of the statutory law by respondents in refusing to place his name on the ballot. The only explanation given by respondents to relator that his nominating petitions were insufficient was "insufficient signatures," and respondents had no legal duty to furnish relator with any further explanation. To compel relator to state the specific facts charging either the misinterpretation or clear disregard of the statutory law or abuse of discretion on the part of respondents, when respondents had given no explanation of the reasons why they invalidated a considerable number of signatures on relator's petition, would have the effect of denying him any effective legal remedy to challenge the actions of the respondents.

This case can be distinguished from *Sullivan* v. *State, ex rel. O'Connor*, 125 Ohio St. 387, and *Marlin* v. *Board of Elections*, 68 Ohio Law Abs. 539, because both the *Sullivan* and *Marlin cases* are challenging the fact finding authority of the boards of elections, while relator in this case is either accepting the facts found by the respondents but is challenging the application of the statutory law as to the facts or contending that respondents had no facts before them to arrive at their conclusions.

Respondents invalidated six petitions containing ninety signatures because the statements of candidacy therein were notarized by a different notary public than the statements of candidacy contained in the other forty-seven petitions. This was done on authority of a letter from Mr. Ted W. Brown, Secretary of State, who referred to *State, ex rel. Ferguson*, v. *Brown, Secretary of State*, 173 Ohio St. 317, in which appears the following statement on pages 319-320:

"Petition paper No. 9722 from Jackson County was rejected by respondent for the reason that relator's declaration of candidacy thereon is not the same as the ones appearing on other petition papers, in that the name and signature of the notary public administering the oath to relator are completely missing.

"In the opinion of a majority of this court, the statutes of

Ohio relating to elections contemplate essentially *one* declaration of candidacy which shall be *uniform* and *complete* in accordance with the statutory mandates. Such declaration may be an original one at the head of each petition paper circulated, signed by the candidate individually and sworn to, or there may be a single complete original declaration with identical copies thereof heading all other separate nominating petition papers placed in circulation (Section 3513.09, Revised Code), but there may not be a number of declarations varying in substance and form and with material omissions. Surely, the signers of the nominating petition papers have a right to be uniformly advised as to what the candidate has declared concerning his candidacy under oath.''

In *State, ex rel. Cline,* v. *Henderson,* 4 Ohio St. 2d 7, Cline filed a nominating petition consisting of six part-petition papers, each of which contained an identical declaration of candidacy and an affidavit supporting it. The jurat of all statements of candidacy was executed by the same notary public, but there was a variance in the dates in the notary public's jurat. The Ohio Supreme Court issued a writ of mandamus ordering the board of elections to place relator's name on the ballot and stated as follows, at page 8:

''In the *Ferguson case* one petition was rejected by this court on the ground that the political affiliation of the circulator was not stated in the circulator's affidavit. (This involved a party primary election.) A second petition was rejected by this court for the reason that relator's declaration of candidacy was not the same as the declaration of candidacy appearing on other part-petition papers in that the name and signature of the notary administering the oath to the relator was omitted. The third part-petition paper was rejected because, when compared to the other part-petition papers filed, it was apparent that the affidavit in this part-petition paper was signed by the candidate on a different date and the oath thereon was administered by a different notary public.

''It is clear that the material differences occurring in these part-petition papers which were rejected in the *Ferguson case* are of greater substance than the admitted technicality which is raised in the instant case.

''The court, in the *Ferguson case,* said, at page 320:

" '* * * the signers of the nominating petition papers have a right to be uniformly advised as to what the candidate has declared concerning his candidacy under oath.'

"In the instant case, the statement of candidacy which appeared on each part-petition paper, under oath, was uniform. The only deviation that appears in the part-petition papers is a variance in the dates inserted, by mistake or inadvertence, in the notary's jurats.

" * * *

"In the instant case, the only variance from the original was in the dates in the jurats of the notary public. This would not mislead anyone signing the petition. To disqualify a candidate from seeking public office on such a minor technicality, which could easily occur by mistake or inadvertence, would serve no public purpose."

On the basis of the *Cline case*, we hold that the fact that relator's statements of candidacy were notarized by two different notaries would not mislead anyone signing the petition and it would serve no public purpose to invalidate these six petitions. We, therefore, hold that the valid signatures on the six petitions where the statement of candidacy was notarized by Robert G. Gilbert should be counted.

Respondents invalidated numerous signatures on the petitions of relator on the basis that some one other than the signer wrote the address or date of signing or placed ditto marks for "Youngstown" or the date.

There is no question that respondents acted in good faith in doing this, because they had received a letter dated June 7, 1965, from Ted W. Brown, Secretary of State, with the following instruction:

" * * * As to placing the date of signing after the signature, Section 3501.38 (C) provides that each signer is to place on the petition after his name the date of signing. Since this is a mandatory statute, any signature not followed by the date of signing is not a valid signature. Furthermore, no other person can fill the deficiency. Each signer must write his own name and address and date of signing. * * *."

Section 3501.38 (C), Revised Code, provides as follows:

" (C) Each signer shall place on the petition after his name the date of signing and the location of his voting residence, in-

cluding the street and number if in a municipal corporation or the rural route number, post office address, or township if outside a municipal corporation.''

While we respect Ted W. Brown as a conscientious public official who has ably performed his duties as chief election officer of Ohio, we have to recognize that he is not the final authority on election laws. The ultimate authority on election laws in Ohio is the Supreme Court, and in the case of *State, ex rel. Patton,* v. *Myers, Secy. of State,* 127 Ohio St. 95, the court construed the language of Section 1*g*, Article II of the Constitution of Ohio, concerning initiative and referendum petitions which contains similar language to Section 3501.38 (C) and stated as follows on pages 96-97:

''These provisions seem to the majority of the court conclusive. They require the names of all signers to be written in ink, 'each signer for himself,' and hence signify that the name can be signed by no one except the elector sponsoring the petition. With reference to the township and the county, the municipality, the street number, the ward and precinct, Section 1*g* simply requires that the signer shall 'state' or 'place' on the petition this information. This 'stating' or 'placing' is sharply distinguished both in word and in meaning from the signing of the name by 'each signer for himself.' Hence we hold in the mandamus action that it is not necessary for an elector himself to write out the date, his place of residence, the township and county, the municipality, the street number, or the ward or precinct. He is required to sign his own name, and if the other information called for is properly filled in by some one else, at the direction and with the authority of the elector signing the petition, the Constitution has been complied with. * * *.''

Since this is a decision of our Supreme Court, it is the law of Ohio, and we are bound by it. We are glad to follow it, because we feel that it is sound law. This case is an example of what happens if someone other than the signer fills in the place of residence or the date of signing with the permission of the signer. Electors who have difficulty in writing, such as old people or naturalized citizens of limited education, would, for all practical purposes, be eliminated as possible signers of nominating petitions.

We feel that the public purpose of nominating petitions is to limit the number of candidates being placed on the ballot to those who have sufficient support from other electors to justify the expense of permitting them a place on the ballot. In this case, the Legislature has prescribed a formula in which relator must produce 551 valid signatures. We feel that the fact that a registered voter signed the petition is sufficient proof that he is interested in the candidate being on the ballot. However, the legislation requires that the date of signing and the location of his voting residence be "placed" on the petition. We feel that the public purpose of this requirement is to enable the board of elections to determine whether the signer of the petition timely signed the petition and is a registered voter.

We, therefore, hold that it is not necessary for an elector himself to write out the date of signing and the location of his voting residence. He is required to sign his own name, and if the other information called for, such as date of signing and location of his voting residence, is properly filled in by some one else, at the direction and with the authority of the elector signing the petition, Section 3501.38 (C) has been complied with.

We further hold that under Section 3501.38 (C), Revised Code, a signer of a nominating petition or some other person, under his authority and direction, may use ditto marks to indicate the date of signing or location of his voting residence.

Several circulators testified in the hearing before respondents, and they all testified that whenever the address or date of signing were filled in it was done with the permission of the signer.

We, therefore, hold that the following signatures, previously invalidated by respondents, are valid as a matter of law because they were filled in with the consent of the signer:

| | |
|---|---|
| Ditto marks under Youngstown | 55 |
| Ditto marks under date | 13 |
| Street address written in | 10 |
| Date written in | 23 |
| Total | 101 |

One of the most difficult and perplexing problems raised by relator is the claimed abuse of discretion of the board of

elections wherein all the signatures on a petition were invalidated by reason of the fact of a circulator's affidavit having been found by the board to be fraudulent.

This question has from time to time been litigated in the courts of Ohio. A cursory reading and comparison of the cases might lead one to the conclusion that some of the most cited cases are inconsistent. In the opinion of this court, however, there is a clear thread of consistency to be found in all of them.

Before discussing the disputed facts relative to the invalidated petitions at issue herein, it would be well to discuss the principal cases set out by both respondents and relator in their respective briefs, in view of the fact that in some instances the parties are citing these cases as authority for diametrically opposed points of view.

Most decisions as to the fraudulent affidavits of circulators are predicated on the fundamentals set out in *State, ex rel. Gongwer, v. Graves, Secretary of State,* 90 Ohio St. 311, wherein at page 324 may be found the following:

"*It is not sufficient that some of the signatures on some of the parts of a petition are genuine, nor is it absolutely necessary to the validity of the petition or any part thereof that every signature thereon should be genuine; but it is absolutely necessary to the validity of the petition or any part thereof that the circulator, when he makes affidavit certifying the signatures on these petitions, should believe that he is stating the truth.* If it later appear that some one has imposed upon him and signed or forged the name of another, the circulator may still believe in the truth of his affidavit and it will support every genuine signature upon it, and only the ones not genuine will be stricken therefrom. But if the circulator knew that a signature appearing on such part of a petition was not genuine; if he knew that such signature was not written on the petition in his presence; if he knew that the person whose signature it purports to be was not an elector; if he knew that the person signing said petition did not sign it with knowledge of its contents, *yet, notwithstanding his knowledge, he wilfully, corruptly and intentionally makes a false and perjured affidavit to the contrary,* then such affidavit is worthless and the petition or part of a petition to which it is attached does not fill the requirement of the Consti-

tution, and the genuine signatures thereon cannot be counted for the reason that that part of the petition lacks the affidavit required by the Constitution.'' (Emphasis added.)

In *State, ex rel. Pucel,* v. *Green,* 101 Ohio App. 531 (judgment affirmed 165 Ohio St. 175), the following facts existed. Two petitions submitted by a candidate for Delegate to the Democratic National Convention were invalidated by the Cuyahoga County Board of Elections. The first, or Antoni petition as we will hereafter refer to it, was invalidated for the reason that the board found that Mary Antoni's name had been signed by her husband, and thus the circulator's affidavit was false and all fifty-six signatures had to be invalidated. The board arrived at this decision by a comparison of both Antoni signatures with others which were previously signed to deeds, escrow agreements, notes, etc., which were conceded to be genuine. It is interesting to note that the board never made any inquiry of the *circulator* nor was he called to testify. The court reversed the board's finding, holding at page 533:

"* * * The board, in coming to its conclusion, must have completely disregarded the sworn testimony of witnesses, such testimony being uncontroverted in the record except for a comparison of handwriting (where neither of those whose signatures are challenged were requested to sign the name of the other for comparison with a genuine signature), * * *. The board, therefore, committed an abuse of discretion in excluding exhibit No. A-2 and holding that the signature thereon could not be counted in considering the sufficiency of relator's nominating petition. * * *''

At this point the court had determined that relator now had sufficient valid signatures to be entitled to be placed on the ballot, but the court was still concerned with the board's ruling as to the second petition, which we shall call the Martin petition, which had also been invalidated.

The facts as to the Martin petition were in substance as follows: The circulator presented the petition in the Martin home for Mrs. Martin to sign. She did so in the presence of the circulator and her husband. Her husband was asked to sign, but because he did not have his glasses he asked his wife to sign his name, which she did. Because the circulator's affidavit

was to the effect that each signer had signed the petition, and in fact Mr. Martin had not done so, the board vitiated the entire petition of thirty-nine signatures.

In reversing the board the court had this to say at page 536:

"* * * Under like circumstances under the law of contracts if this procedure had been followed in signing an agreement the husband would, without the slightest doubt, be completely bound. Here he adopted the signature written for him in his presence as his. A technical interpretation of the election laws might justify a crossing out of the signature of Robert Martin, but there is no justification for striking out the whole petition because of the claim that the affidavit of the circulator was fraudulently made. *There is not the slightest suggestion of fraud, chargeable to Robert Martin,* in the signing of the relator's nominating petition *or on the part of the circulator* in signing the affidavit, whereby this case is clearly distinguishable from the case of *State, ex rel. Gongwer,* v. *Graves, supra* (90 Ohio St. 311), which was decided on the basis of fraud on the part of circulators of the petitions filed." (Emphasis added.)

It is claimed by the respondents herein that the court's remarks in the *Pucel case* as to the Martin petition are merely *dicta* and were so labeled by the court. However, paragraph two of the syllabus, which stands as part of the law of that case, reads as follows:

"Where a wife signs her husband's name on a nominating petition, at his request and in his presence and in the presence of the circulator thereof, and where there is not the slightest suggestion of fraud on the part of the husband or on the part of the circulator of the petition in signing the affidavit attached thereto, there is no justification for invalidating the entire petition because of the claim that such affidavit was fraudulently made."

Clearly this syllabus was framed with solely the Martin fact situation in mind.

Upon appeal to the Ohio Supreme Court, that court adopted verbatim the finding of the Court of Appeals relative to the Antoni petition, and did not consider the Martin petition since the signatures contained thereon would be surplusage.

Of special import is the following quotation which was used by the Court of Appeals and adopted by the Supreme Court at page 176:

" 'In dealing with this question the election board was acting in a *quasi-judicial capacity*. Its function was to determine the validity of the petitions offered by the relator with impartiality and fairness *both to the candidate and to the electors of the county. * * *.' "   (Emphasis added.)

At this point a pertinent observation is in order and should be emphasized. Even though it was clear that the circulator of the Martin petition *knew* that Mr. Martin had not signed his own name, this fact alone, *unless accompanied by evidence of fraud on the part of the husband or the circulator,* is not sufficient to invalidate the whole petition on the basis of a fraudulent circulator's affidavit. *Intent* and *knowledge* are the gravamen of the fraud, and the language in paragraph six of the syllabus of *State, ex rel. Gongwer,* v. *Graves, Secretary of State,* 90 Ohio St. 311, is to that effect:

"An affidavit *intentionally* and *knowingly* false, attached to any part of a petition, is not a compliance with the provisions of Section 1*g* of Article II of the Constitution of the state, and the part of a petition, to which such false affidavit is attached, must be rejected entirely, the same as a part to which no affidavit is attached, whether it contains genuine names or not, for the reason that it lacks the affidavit required by the Constitution."   (Emphasis added.)

It is strongly urged by the respondents that since the ruling in the *Pucel case, supra,* the same Judges of the Eighth District Court of Appeals (Cuyahoga County) have ruled differently from their ruling in the *Pucel case,* and have in effect reversed themselves in the case of *Simon* v. *Board of Elections of Cuyahoga County,* 87 Ohio Law Abs. 594.

Respondents claim the ruling of the *Simon case* is applicable to the case at bar in that the issues are substantially the same.

Judge Kovachy, at page 595, in the *Simon case,* sets out the following salient facts:

"The transcript of the proceedings before the board discloses *undisputed* evidence that signatures were affixed to petition paper numbers 206, 209, and 191 not in the presence of the persons signing them as circulators. These petition papers had 59 signatures on them.

"Notwithstanding such evidence before it, the resolution entered by the board shows that the protest against these petition papers was disallowed.

"The resolution also shows that the protest against 21 petition papers *containing signatures in the same handwriting* was allowed only as to the signatures so affixed, 40 in number, and declared such signatures void but disallowed the protest as to the remaining signatures. The total number of signatures on these petition papers was 421." (Emphasis added in part.)

In its application of the law to this state of facts, the Eighth District Court of Appeals, quoting from *State, ex rel. Waltz,* v. *Michell,* 124 Ohio St. 161, said at page 596:

" 'Other petition papers which were rejected had signatures in the same handwriting and therefore, the affidavit of the circulator that the signatures were made in his presence and were the genuine signatures of the persons whose names they purported to be could not have been true. We are of the opinion that the city council was correct in its holding that the requirement that the name of the signer to such petition be written by himself is mandatory, and that signing petitions by proxy is not permissible. In each of these instances the affidavits must have been *intentionally* and *knowingly* false, and under the *Graves case, supra,* their rejection was warranted.' " (Emphasis added.)

In kindness, a court might conclude that the Simon signatures were signed by proxy. Harsh truth could lead to the conclusion that they were forged.

Under the facts of that case the court was in no way inconsistent with its prior holding in the *Pucel case.* Under the facts of the Simon petitions it was perfectly proper to reject the petitions containing "proxy" signatures in toto. Clearly, knowledge and intention are self-evident.

In the instant case, we are concerned with neither proxy nor forged signatures. In both the *Graves case* and the *Simon case* the petitions were replete with forged or "proxy" signatures. Such is not the finding of the board in regard to the petitions filed by Mr. Donofrio. One Donofrio circulator testified that he telephoned his parents for permission to sign their names to his petition. Permission granted, he did so, stating at the protest hearing he thought this was permissible. Likewise, the same circulator, with telephone permission, wrote in the name of two friends. On this testimony, the board invalidated the entire petition, and the relator herein concedes that this

petition should not be considered. In two other instances the board, by reference to the registration cards on file, concluded that the signatures were not genuine. These instances are later discussed. But for these exceptions there is no question as to the genuineness of all other signatures submitted, and nowhere does the record disclose two or more signatures in the same handwriting.

As has been previously pointed out in *State, ex rel. Pucel*, v. *Green*, 165 Ohio St. 175, at page 176, a board of elections sits as a quasi-judicial body in determining the validity of petitions filed with it. As such it must of necessity exercise its discretion in the factual determinations it is called upon to make, and in the proper application of the law to factual determinations its findings should remain undisturbed. However, the misapplication of law to the facts is subject to judicial review.

Petition number 2 has previously been determined to be valid even though it was notarized by a different notary. The *amicus curiae* brief indicates that additional action was taken by the board on this petition, to wit:

"Following the protest hearing, the board examined this petition paper and it was then decided by the board that this petition paper also contained a fraudulent signature, to wit: Signature No. 15 Mary Ann Santore, 710 Cassius Avenue, Youngstown, Ohio. The board came to this conclusion by comparing the aforementioned signature No. 15 with the signature of Mary Ann Santore, 710 Cassius Ave., Youngstown, Ohio, as it appeared on her official registration card * * *."

A reading of the record of the protest hearing does not disclose how the board reached this conclusion. The only reference to be found is on respondents' Exhibit No. 4 which notes "F. S. No. 15." Conceding for the purposes of argument that the board proceeded as outlined by counsel for *amicus curiae*, it does not follow that such a finding would invalidate the other thirteen signatures on the petition (number 6 not being a registered elector).

The board did not subpoena the suspect elector to inquire as to whether she did sign the petition, and the testimony of the circulator was clearly to the effect that every signature was affixed in his presence. Merely by a comparison of signatures did the board conclude that the circulator's oath was fraudulent.

This clearly is contrary to the law in the *Pucel case, supra*. The board in its discretion could refuse to count the questioned signature, but in imputing a fraudulent oath to the circulator on such facts, it was clearly in error. The thirteen valid signatures on this petition should have been counted, and we so hold.

Petition number 4, circulated by one George Gallo, was invalidated for the reason that the board found the affidavit of the circulator, relative to signature No. 2, was fraudulent.

A reading of the protest hearing of the board of elections does not disclose one iota of evidence that Gallo knowingly and intentionally signed a false affidavit. Gallo was intensively interrogated by the members of the board and by counsel for both the respondents and the relator. Signer No. 2, Mrs. Tony Matsi, was not called by the board to testify. The board found that her name was in fact signed by her husband. The circulator testified that all signatures were made in his presence. No additional testimony as to the facts involving this petition is to be found in the record taken before the board of elections. The clerk of the board testified before the *trial court* relative to this petition:

"Q. * * *Let's come to petition No. 4 now. That is a petition which was circulated by a man by the name of Gallo, and you have in this tabulation of yours invalidated. You invalidated every signature on that petition upon the basis that Mr. Gallo was guilty of some kind of a fraud, isn't that right? A. That is right.

"Q. The board did that? A. That is right.

"Q. Now what was his fraud? A. If you'll look at signature No. 2 which is Mrs. Tony Matsi, 124 E. Midlothian Boulevard, and if he said that he saw all of these people sign it, this is in fact Tony's signature.

"Q. When was that brought out? A. What do you mean, 'when was that brought out'?

"Q. Not in the Hanni hearing. A. It wasn't brought out in the Hanni hearing.

"Q. Well, did you invalidate it before the Hanni hearing? A. No, sir.

"Q. Well then you have knocked down every signature on this petition without giving Mr. Donofrio an opportunity to be heard in any respect about the validity of this signature, haven't you? A. Mr. Ranz, I think that the law gives Mr. Donofrio all

the opportunity in the world to be heard. As a matter of fact, Mr. Donofrio had an opportunity to come down to the board of elections after the first determination, and come in and question the board as to whether or not they were right in their first determination. This he failed to do after the protest hearing of Mr. Hanni. Then it was mandatory on the board to make a final determination on these particular petitions and this is exactly what sheet Exhibit 4 shows.

"Q. Are you saying to this court that after this Hanni hearing was over, and without giving Mr. Donofrio an opportunity to be heard in the matter, that you invalidated this petition No. 4? A. We gave Mr. Donofrio every opportunity to come to the board of elections. We did not deny Mr. Donofrio any right to come into the board of elections and check this out.

"Q. Did Judge Hanni claim that this signature No. 2 on this petition was invalid? A. I don't know.

"Q. Well you know that there was no claim by him at all in this hearing that there was anything invalid about that petition, don't you? A. There was no question in the hearing about it.

"Q. That's right. A. That is correct.

"Q. And the board on its own after this hearing was over, invalidated this signature? A. That is correct."

We cannot question the board's determination relative to the Matsi signature. That decision of fact was solely within its province. But the inference drawn, that a fraudulent affidavit was made on the evidence adduced, was a clear abuse of discretion and a misapplication of the law set out in *Pucel, supra.*

We find that the petition was proper and the remaining fourteen signatures thereon are valid.

Petition number 10 was circulated by Joseph Guerriero. The circulator went to the home of one Milford Cole, whom he did not know. Mrs. Cole signed the petition. She then asked the circulator if she could take the petition upstairs for her husband to sign, he being ill in bed. She did so, and Mr. Cole signed in his room, not in the presence of the circulator. The circulator readily admitted these facts before the board, saying he thought that this was proper. On this evidence, the board invalidated the entire petition and disallowed all fifteen names. Under the rule of the *Pucel case, supra,* this clearly was an abuse of discretion, for "there is not the slightest suggestion of

fraud on the part of the husband or of the circulator of the petition in signing the affidavit attached thereto.'' A technical interpretation of the election law would justify the board's crossing out the signature of Milford Cole, but the other fourteen signatures on the petition are valid and should be counted. The board in this instance abused its discretion in failing to so rule.

Petition No. 22 was circulated by one Reginald Melia. Three witnesses in addition to Mr. Melia testified relative to this petition. The entire petition was excluded by reason of the purportedly fraudulent affidavit of the circulator. In addition, the board questioned electors Yanek and Botsco relative to the word ''Youngstown'' and the date, which were inserted opposite their signatures in handwriting other than their own. Both testified they had signed their names and addresses. Melia testified he was given permission to insert the above words. Mr. Yanek did not remember whether he had given permission. Mrs. Botsco said she had not given permission. Under the previously discussed ruling of *State, ex rel. Patton,* v. *Myers,* 127 Ohio St. 95, in its quasi-judicial capacity the board could properly, in its discretion, have invalidated the signatures of both of these electors, but nowhere is there any evidence that Melia knowingly and intentially made a fraudulent oath as to their signatures.

In the same petition are to be found the names of Ambrose Dragoui and Katherine Dragoui. The signatures and addresses and date were in the handwriting of Mr. and Mrs. Dragoui. The testimony of Mr. Dragoui was to the effect that he had been asked by a boy by the name of Dapolito to sign the petition. Young Dapolito was a friend of the signer's son. As to the question of whether Melia was present when Dragoui and his wife signed, Melia testified that he and young Dapolito had worked together on some of the petitions he had circulated, and he (Melia) saw both sign this one while sitting in their car. Dragoui testified that Mr. Melia could have been close by the car but that he doubted if he (Melia) was close enough to actually see him sign. In answer to a question proposed Mr. Gragoui's testimony was as follows:

''Mr. Henderson: When you say he was not there, what do you mean? A. He wasn't there to see me put my signature on the ballot. He could have been behind me or in front of me, that I don't know. He claimed that he come with the petition. It

wasn't him, he wasn't there when I signed this petition. But I do not deny that he was somewhere in the vicinity, that I agree, because these young boys, these football players, he might have come up and said, 'here, run and get that guy for me.' That's a practice."

The board held the oath taken by Melia was fraudulent and rejected the entire petition. In addition, the board held that the signature of one Rose Miller was invalid because she was not a registered voter.

It is not the function of this court to question the findings of fact made by the board of elections relative to this petition. To exclude the genuine signatures of Botsco, Yanek and Mr. and Mrs. Dragoui as well as that of Rose Miller was properly within its discretion. To conclude from such evidence, however, that Melia knowingly and intentionally made a fraudulent oath and that, therefore, all other signatures were void, is clearly an abuse of discretion and a misapplication of the election laws. The ten valid signatures should properly have been counted.

Relator claims that in addition to the petitions hereinbefore considered there are other valid signatures contained in the petions he has filed with the board of elections. Whether this contention is true or not is of no moment to this decision by reason of the fact that we have concluded that 551 signatures have already been demonstrated to be valid, and there is no reason to further extend an already lengthy opinion.

Having submitted the required 551 signatures necessary to place his name in nomination for the office which he seeks, a journal entry will be drawn by the relator in accordance with this opinion, directing the respondent board of elections to post his name as a candidate for the office of Municipal Judge of the city of Youngstown for the term commencing January 2, 1966, and to place the same on the ballot in accordance with law for consideration by the electorate in the Youngstown municipal election on November 2, 1965.

The judgment of the trial court is reversed. Writ of mandamus allowed.

*Judgment reversed.*

LYNCH, J., concurs.

JONES, J., dissenting. The case appears before this court as an appeal on questions of law only. It is from an order of the Common Pleas Court of Mahoning County. In that court the appellant's petition for writ of mandamus was dismissed for want of jurisdiction.

On February 2, 1965, Mr. Donofrio filed with the board of elections a nominating petition consisting of 53 papers and containing, in all, 736 signatures. The petition was intended to establish him as a candidate for the office of Judge of the Municipal Court of the city of Youngstown, Ohio, for the full term commencing January 2, 1966.

On July 15, 1965, the board notified Mr. Donofrio that his nominating petition had been rejected for the following reason: "Insufficient signatures." On July 30, 1965, Judge Don Hanni, an elector, filed a protest before the board of elections claiming, in substance, that there were additional invalid signatures contained in the Donofrio nominating petiton. Two days later Mr. Donofrio filed a petition for writ of mandamus in the Mahoning County Court of Common Pleas. He asked that court to order the election board to place his name on the ballot as above mentioned. After the protest hearing, the election board reduced the number of signatures allowed; there remained at that point only 327 valid signatures. Based on a second decision of the election board, Mr. Donofrio filed a supplemental petition for writ of mandamus. The petiton was dismissed by the trial court, and an appeal was timely filed in this court. It is agreed by both parties that 551 valid signatures are required in order that Mr. Donofrio may successfully have his name on the November 2 ballot.

Mr. Donofrio asks this court to do that which he honestly feels the trial court should have done and failed to do, i.e., grant the writ of mandamus which would order the Board of Elections of Mahoning County to place his name on the ballot November 2, 1965.

The principles governing the issuance of this writ are the same as in those cases that are seemingly less dramatic and of less public interest. The law is quite explicit. There must be a clear right to the relief sought.

The trial court dismissed the petiton for the reason that the allegations, as set forth in the petiton, under the Ohio law, did

not give the Common Pleas Court jurisdiction to review the election board's multitudinous findings. The dismissal was based upon the reasoning that the allegations in the petition did not specifically allege that the acts of the board of elections were performed capriciously and in bad faith. The court noted that the allegations in the petition must be specfic as to the facts constituting the alleged abuse of discretion. (*State, ex rel. Maxwell, Pros. Atty.*, v. *Schneider*, 103 Ohio St. 492, at 498; *Sullivan* v. *State, ex rel. O'Connor*, 125 Ohio St. 387.)

It is from this dismissal order that Mr. Donofrio appeals and assigns as error:

"The court below erred in refusing to assume jurisdiction and to issue a writ of mandamus requiring respondent to place relator's name on the ballot for November 2, 1965, general election, as a candidate for the office of Municipal Judge for the city of Youngstown, Ohio."

At the time of the order, the court may well have been right. If the relator intended to attack a factual determination it was required that he allege in his petition that the findings by the board of elections on these matters were the result of fraud or corruption. *State, ex rel. Waltz*, v. *Michell*, 124 Ohio St. 161.

Further, if the relator intended to attack a legal determination he had to allege in his petition that the findings by the election board on these matters were the result of flagrant misinterpretation of a statute or a clear disregard of legal provisions applicable thereto. *State, ex rel. Hanna*, v. *Milburn*, 170 Ohio St 9. See, also, *Sullivan* v. *State, ex rel. O'Connor*, 125 Ohio St. 387, 392.

Since the time of the lower court's determination, the Ohio Supreme Court has announced its decision in the *Cline* case, *State, ex rel. Cline*, v. *Henderson*, 4 Ohio St. 2d 7, wherein the question of jurisdiction was raised by the respondents filing of a demurrer to the relator's petition. Counsel for Cline are also counsel for Mr. Donofrio, and it is of interest to note that the jurisdictional allegations in both cases are identical, to wit:

"In so finding the board failed in the performance of its legal duty to count all valid signatures on said petition and acted unlawfully, arbitrarily and abused its discretion."

The gray area has now been cleared. Based upon the identical jurisdictional allegations contained in the Donofrio peti-

tion for writ of mandamus, the jurisdiction of the Common Pleas Court was invoked.

Beyond invoking jurisdiction, the *Cline case, supra,* decided October 5, 1965, by the Ohio Supreme Court, is applicable here in a limited capacity. It is not "carte blanche" authority to issue a writ in this case. Mr. Cline filed, with the board of elections, a nominating petiton consisting of six part-petition papers. Each of the papers contained a declaration of candidacy and an affidavit supporting it. A variance in dates appeared in the notary's jurat. In other words, the same declarant signed identical part-petitions and his oath was administered by the same notary, but in some instances on different dates. The Ohio Supreme Court held that this could not mislead any elector intending to sign the petition. The writ was issued and Paul Cline's name will appear on the ballot November 2, 1965. *NONE* of the signatures of the Donofrio nominating petition were held invalid for the reason that the signatures in the *Cline case* were allowed by the Supreme Court. The facts of the two cases are not the same. We are mindful that the Supreme Court also stated: "* * * to disqualify a candidate from seeking public office on such a minor technicality, which could easily occur by mistake or inadvertence, would serve no public purpose." With this I agree. So does Mr. Donofrio when he states on page 35 of his brief:

"To insure the continued existence of our demoncratic form of government, men must always have a right to present themselves as candidates for public offices upon a reasonable compliance with our election laws."

Turning to page two of appellant's brief as a guideline, I will discuss the invalidated signatures:

"(1) Six (6) petitions, containing ninety (90) signatures were rejected because the statements of candidacy contained therein were notarized by a different Notary than the statements of candidacy contained in the other forty-seven (47) petitions."

A primary petition (Declaration of Candidacy) is described in Sections 3513.05, 3513.07 and 3513.09, Revised Code. A nominating petition (Statement of Candidacy) is described in Section 3513.261. The latter refers to the requirements of the nomination as an independant by petition, and the former re-

fers to partisan primary nominations. The case of *State, ex rel. Ferguson*, v. *Brown, Secretary of State*, 173 Ohio St. 317, decided in 1962, involved a partisan primary election. Both parties to this controversy use the *Ferguson case* to support their respective positions in relation to the "two-notary" question. Without deciding this issue by means of the *Ferguson case*, and the other cases cited in briefs, I rely upon the *Cline case*. The real issue is: Would this technical irregularity mislead an elector in his signing of a petition? I think not. This is a minor technicality. To eliminate signatures for this reason alone would serve no public purpose, and the valid signatures of these part-petitions should be counted.

"Seven (7) petitions containing one hundred five (105) signatures contained false affidavits because of improper circulation."

Herein lies the heart of the matter before us—the eye of the storm. The record discloses that, in all, 190 signatures were invalidated because the petition contained "false affidavits" on the part of the circulators. Testimony directed to this point is voluminous. The election board heard a parade of witnesses regarding the issue of "false affidavits."

Section 3501.38, Revised Code, reads in part:

"* * *

"(D) No person shall write any name other than his own on any petition. No person may authorize another to sign for him.

"(E) Every petition paper shall bear the affidavit of the circulator that he witnessed the affixing of every signature, that all signers were to the best of his knowledge and belief qualified to sign, and that every signature is to the best of his knowledge and belief the signature of the person whose signature it purports to be.

"(F) If a circulator knowingly permits an unqualified person to sign a petition paper or permits a person to write a name other than his own on a petition paper, that petition paper is invalid; otherwise the signature of a person not qualified to sign shall be rejected but shall not invalidate the other valid signatures on the paper."

However, any violation of the above provisions or any other provisions found in Title 35 of the Revised Code constitutes a

prima facie case of fraud within the purview of such Title (Section 3599.42, Revised Code).

The oath taken by the circulator is as follows (Section 3513.-261, Revised Code):

"* * * being duly sworn, deposes and says that he is a qualified elector of the state of Ohio and resides at the address appearing below his signature hereto; that he is the circulator of the foregoing petition paper containing        signatures; that he witnessed the affixing of every signature, that all signers were to the best of his knowledge and belief qualified to sign, and that every signature is to the best of his knowledge and belief the signature of the person whose signature it purports to be."

The testimony is extensive and the briefs are long concerning the issue of the "false affidavits" of the circulators. Notwithstanding the fact that decisions of a board of elections in election matters are, by statute, declared to be final (Section 3513.262, Revised Code), the decisions may nevertheless be reviewed where: by disallowing signatures, the board of elections displayed a flagrant misinterpretation of a statute or displayed a clear disregard of legal provisions applicable thereto or a clear abuse of discretion. (*State, ex rel. Flynn*, v. *Board of Elections of Cuyahoga County*, 164 Ohio St. 193.)

I quite agree with relator's statement in his brief:

"* * * a finding of fact by a board of elections on a factual issue may not be set aside. This is what our Supreme Court held in the *Sullivan case*" (125 Ohio St. 387).

There is no reason to detail each and every signature on the petition papers that were disallowed in this category. *However, the state of the record before me is such that I can say with firm conviction that the decision of the board of elections relating to the 190 signatures was not made as the result of fraud or corruption on its part nor has it been guilty of a flagrant misinterpretation of the law nor has it disregarded legal principles. The board properly applied its discretion, within prescribed limits, to all 190 names.*

Relator conceded that the election board properly disallowed the twelve signatures for the reason that the signers were "not registered." Further, by properly disallowing 190

signatures for the reason that the circulator made a "false affidavit" the number of valid signatures would be less than is required.

Since the majority of this court declared the signatures contained on papers 4, 10 and 22 to be valid, but all other signatures under the category of "false affidavits" to be invalid, comment should be directed to these papers. (It is noted that some signatures that were found on these papers were disallowed by the majority for other reasons.) We differ in that I would uphold the election board's action in relation to all these petition papers containing the 190 names.

A similar course of conduct prevailed among the circulators of all thirteen papers disallowed by the board of elections. *I feel compelled to apply the same rule to all thirteen papers upon review and cannot reconcile allowing three and rejecting ten.*

Paper number 4 was circulated by a Mr. Gallo. The bill of exceptions clearly discloses the reason why this paper was invalidated in toto. In explaining the action of the board of elections Mr. Rogers testified in the lower court:

"Q. * * * Lets come to petition No. 4 now. This is a petition which was circulated by a man by the name of Gallo, and you have in this tabulation of yours invalidated. You invalidated every signature on that petition upon the basis that Mr. Gallo was guilty of some kind of a fraud, isn't that right. A. That is right.

"Q. The board did that? A. That is right.

"Q. Now what was his fraud? A. If you'll look at signature No. 2 which is Mrs. Tony Matsi, 124 E. Midlothian Boulevard, and if he said that he saw all of these people sign it, this is in fact Tony's signature. * * *."

It is obvious that Mr. Matsi signed his wife's name in the presence of the circulator.

Counsel for relator argues that there is not a "syllable of testimony" that was before the board on this matter. The point is, however, that we have before us the testimony of Mr. Rogers, given in the lower court, who explained the action taken by the board. The members of the board concluded that Mrs. Tony Matsi did not sign her name and that the circulator knew

this to be the fact and that his affidavit was false. In disallowing paper number 4 the board of elections acted within the limits of the *Flynn case.*

Paper number 10 was circulated by a Mr. Guerriero. The board of elections disallowed all the signatures on this paper for the reason that the circulator made a false affidavit. Mr. Guerriero went to the Cole house. Mrs. Cole signed her name and took the paper upstairs to be signed by Mr. Cole. Admittedly, the purported signature of Mr. Cole was not made in the presence of Mr. Guerriero. When asked, ''Then, sir, would you agree that your affidavit at the end of that petition was incorrect?,'' Mr. Guerriero replied, ''A. Yes, I would.''

*State, ex rel. Pucel,* v. *Green,* 101 Ohio App. 531, is distinguishable. The facts differ. In the *Pucel case,* the wife signed for her husband in the *presence of the circulator.* In this case it cannot be determined what did in fact happen upstairs in the Cole house. The Coles were not summoned to testify before the board of elections. The circulator admitted that he did not witness the signing of all the names to the petition, but under oath in his petition he stated that he had. Here again the rule of the *Flynn case* (164 Ohio St. 193) is met by the board of elections.

Paper number 22 was circulated by a Mr. Melia. The board of elections disallowed all the signatures on this paper for the reason that the circulator made a false affidavit. One signer, Mr. Dragoui, testified that he had never seen Mr. Melia, the circulator; that a boy named ''D'Apolito'' approached him for his signature. After considering conflicting testimony, the board concluded that Mr. Melia's affidavit was false. As Judge Jenkins, the trial judge, put it:

''* * * Because we must remember that as in every trial in court where the jury is the trier of the facts, the board in this instance was the jury, and they had a right to believe whom they wanted to believe on what they had before them. I can't go into the question of why they believed one person and didn't believe another. I can't go into that.''

The Legislature has empowered the board of elections with the authority to determine the validity or invalidity of a nominating petition and established the procedures for the elec-

tion board to follow. This court is simply not permitted to substitute its decision for that of the Board of Elections of Mahoning County when it finds that the board of elections did not flagrantly misinterpret the law or abuse its discretion. Elections belong to the political branch of the government. It is not the function of this court to "look into the heart" of the circulator as we are asked to do by the relator in testing the "false affidavit" signatures. The board of elections, in disallowing the 190 signatures, concluded that the statutory presumption of fraud had not been rebutted. Though the actions of the circulators in the *Gongwer case (State, ex rel. Gongwer, v. Graves, Secretary of State,* 90 Ohio St. 311) were less subtle, it appears to me, and it appeared to the board, that there was a systematic course of legal fraud on the part of the circulators of those part petitions that were disallowed for "false affidavits." Paragraph four of the syllabus of the *Gongwer case* states:

"Where it appears from the evidence that any circulators of parts of a petition have been guilty of a systematic course of fraud and forgery in procuring and writing names thereon, and have wilfully and intentionally sworn to false affidavits attached thereto, it is neither fraudulent nor an abuse of discretion on the part of the Secretary of State to reject all parts of the petition procured by such circulators."

The court held this to be so "notwithstanding there is a conflict of evidence upon that question." Continuing further with the *Graves case* (paragraph six of the syllabus):

"An affidavit intentionally and knowingly false, attached to any part of a petition, is not a compliance with the provisions of Section 1*g* of Article II of the Constitution of the state, and the part of a petition to which such false affidavit is attached, must be rejected entirely, * * *."

(See, also, *Simon* v. *Board of Elections of Cuyahoga County,* 87 Ohio Law Abs. 594. This is the same court that decided the *Pucel case* [101 Ohio App. 531].)

The Ohio Supreme Court has spoken out in clear language the principles this reviewing court must follow in considering rulings of a board of elections. This court must find a "flagrant misinterpretation of a statute, or a clear disregard of legal

provisions applicable thereto." So spoke the Ohio Supreme Court in the *Flynn case* (164 Ohio St. 193). It is this rule of law that should be followed in considering the "false affidavit" papers. The majority has construed the *Pucel case* to apply. First, the facts of the *Pucel case* differ and, secondly, it is not a Supreme Court case; it was decided by the Cuyahoga County Court of Appeals. In the *Pucel case* three petition papers were considered by the court. The first two were allowed and referred to as the "Antoni" papers. Allowance of the signatures contained on these papers gave the declarant sufficient signatures to qualify to have his name placed upon the ballot. The court then considered a third paper referred to as the "Martin" paper. There, the wife signed for the husband who couldn't find his eyeglasses, at his request and in the presence of the circulator. Under those facts the court held, in the syllabus, that just the one signature should be disallowed and the balance of the signatures on the paper allowed. When the Ohio Supreme Court reviewed the *Pucel case* on its merits (165 Ohio St. 175), it held:

"*Since the first and second petition papers [Antoni] contain more than the required 100 valid signatures, it is unnecessary to consider the validity or invalidity of the third [Martin] petition paper.*"

The inescapable conclusion is that by allowing three of the thirteen petition papers that had been ruled out by the board of elections, is to say that Messrs. Sulligan, Bernard, Henderson and Johnson (the Mahoning County Election Board) flagrantly misinterpreted the law or clearly disregarded applicable legal provisions. I can not so state. The relator has divided his complaint into three categories: One, "different notaries," two, "false affidavits," and three, "ditto marks and causing information other than name to be placed by others with consent of the signers on the papers." There are Supreme Court decisions involving all three categories, and to look to the Supreme Court on two and to ignore the Supreme Court on the third category (false affidavits) in favor of an inapplicable lower court decision (*Pucel case*), as the relator would have us do, is inconsistent and unsound.

The record of the protest hearing before the board of elec-

tions shows that the members performed their duty capably under strenuous conditions. They concerned themselves with the tedious task and made their rulings after hearing every facet of each protest. They exercised their discretion within proper limits as to the "false affidavit" petitions. Perhaps the same board would rule differently now on the "two-notary" protests since learning of the decision in the *Cline, supra, case.*

A candidate for nomination for public office should follow the statutory directions with respect to the requirements. (*State, ex rel. Ferguson,* v. *Brown, Secy. of State,* 173 Ohio St. 317.) As the Ohio Supreme Court has said in *State, ex rel. Weaver,* v. *Wiethe,* 4 Ohio St. 2d 1 (decided September 30, 1965):

"* * * To this [*i. e.,* the *Ferguson* language above paraphrased] may be added the further admonition that if the action taken also *seems* unfair, the remedy lies in a corrective statutory or charter enactment, not with election officials or the courts who are equally bound to abide the clearly mandated result."

It is the duty of the members of the court to interpret the law as they understand it and rule accordingly regardless of whatever reaction there may be to the findings. If the law appears to bring on a harsh result, and one that makes compliance most difficult, it is for the Legislature to reform it. Until such time, circulators must follow the requirements of the statute exactly or the petition papers that they circulate are unacceptable. In this case, clarification and reformation of the election laws are clearly needed. (Two reviewing Judges [Jenkins and Jones] would let stand the election board's ruling, and two Judges [Lynch and Johnson] would reverse the same ruling.) However, for the courts to so "legislate" is to open Pandora's Box and let escape all the "ills" contained therein. Under these circumstances, how can it be said that relator has a "clear right to the relief sought"? Relator seeks an extraordinary remedy, and the burden is upon him to demonstrate that he is, by law, entitled to the relief prayed for in the petition. By following the law, I hold that he has not overcome that burden. Fundamentally, this court is reviewing a petition for writ of mandamus that has been denied by a lower court. We are here con-

cerned with testimony given before two different bodies, the election board and the Court of Common Pleas of Mahoning County. Those "triers of the facts" have made decisions that I do not consider to be founded upon flagrant misinterpretation of the applicable law or abuse of discretion.

There is no need, in this dissent, to comment on the balance of signatures not allowed by the board of elections.

The relator having failed to show a clear right to the relief sought, I would deny the writ and dismiss the petition. The judgment of the lower court should be affirmed for the reasons stated herein.